IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARCUS WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:23-cv-86-ECM |
| | ) | [WO] |
| WEXFORD HEALTH | ) | |
| SOURCES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

## I. INTRODUCTION

Pending before the Court are motions for summary judgment filed by Defendants Wexford Health Sources, Inc. ("Wexford"), (doc. 45), Tahir Siddiq ("Dr. Siddiq"), (doc. 48), and Corenta Scroggins ("Scroggins"), (doc. 51).   At issue are Plaintiff Marcus Washington's ("Washington") claims of deliberate indifference, negligence, and intentional infliction of emotional distress against the Defendants, arising out of the treatment of care for his broken knuckle.   After carefully reviewing the parties' briefing and the evidentiary materials, the Court concludes that the motions are due to be GRANTED.

## II. JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to § 1367.   The

parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### III. STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311. The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material

fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV. FACTS

The evidence reveals the following facts, taken in the light most favorable to Washington.

Washington is an inmate in the Alabama Department of Corrections ("ADOC") who was housed at Bullock County Correctional Facility at the time of the events at issue in this

case.  On December 6, 2020, Washington submitted a sick call request for a hand injury.[1]

When an inmate completes a sick-call request, they are first interviewed by a nurse, who determines whether further treatment is needed.  Scroggins, a nurse at the facility, testified that the facility inputs inmate complaints each day and generates a newsletter with the appointment schedule.  The schedule is then posted in the dorm and given to an officer who will retrieve inmates who do not come to their appointments.  An officer will also radio down to the dorms to request that inmates come to their appointment.

On December 7, 2020, the day after he submitted his sick call request, Washington was seen by Scroggins.  Scroggins performed an assessment on Washington's hand and wrote in her notes for the visit that Washington had "[right] hand pain" and that the hand was "swollen." (Doc. 47-1 at 14).  Scroggins referred Washington to Dr. Siddiq and prescribed him ibuprofen.  Washington then saw Dr. Siddiq, who ordered an x-ray.[2]  On December 9, 2024, Washington was given a hand x-ray and diagnosed with a fracture of the knuckle.

On December 10, 2020, the day Dr. Siddiq received the x-ray results, Dr. Siddiq made a request for Washington to be seen by Dr. Chung, an off-site orthopedist.   When Dr. Siddiq makes a request for an inmate to be seen by an outside provider, he must first

---

[1] Washington first attempted to go to the healthcare unit but was turned away by an officer and told to complete a sick call request form.  Washington testified that officers "jump on inmates" if they stay after being told to submit a sick call form, so Washington complied. (Doc. 58-1 at 24).  Those officers are not parties to this case.

[2] Washington remembers seeing Dr. Siddiq the day he received his x-ray.  Dr. Siddiq indicated in his declaration that he saw Washington the day after his appointment with Scroggins, or on December 8, 2020. (Doc. 47-1 at 3).  Either way, Dr. Siddiq saw Washington within two days of Scroggins' referral.

submit a request to the statewide medical director.   Dr. Siddiq generally met with the statewide medical director on a weekly basis.   At these weekly meetings, Dr. Siddiq would be informed whether his requests had been approved.   Shortly after approval, Dr. Siddiq would receive an authorization number, and the scheduler at Bullock, Jamika Howard ("Howard"), would contact the outside provider to coordinate an appointment and inmate transport.

Washington's appointment with Dr. Chung was originally scheduled for January 11, 2021, but due to reasons outside Dr. Siddiq's control, the appointment was rescheduled for February 8, 2021.   Washington was not given a cast, splint, or wrap for his hand in the interim.   Dr. Siddiq testified that in the time between the x-ray and Washington's appointment, Washington would have been treated for anything that he requested.   For example, if Washington wanted his hand wrapped, he would have needed to request it. (Doc. 58-2 at 9).   Only a specialist, however, could have given Washington a cast. (*Id.*). Dr. Siddiq testified that he had written orders for Washington's pain control several times, and that he was on ibuprofen.   Dr. Siddiq said in his expert report that given the nature of the injury, "[t]here was no damage caused to Mr. Washington as a result of the time between" appointments. (Doc. 47-1 at 7; doc. 47-2 at 6).[3]

On December 17, 2020, Washington completed a health care grievance, where he wrote that after health care providers confirmed he had a broken hand, he was only given ibuprofen and "allegedly ordered a visit with an off-site specialist." (Doc. 47-1 at 20).

---

[3] Both Dr. Siddiq and Scroggins submitted a declaration in their capacities as parties to this case and in their capacities as experts.   The contents of the declarations and expert reports for each are the same.

Inmates are not given information in advance on when their appointments are scheduled. Consequently, Washington did not have information on the date and time of his appointment at the time of his grievance.  The grievance was received by someone at the facility on December 21, 2021, who responded the next day with a note that Washington was scheduled to see a provider, and that Dr. Siddiq would order "pain medication as needed" until the appointment. (Doc. 47-1 at 20).  Washington submitted an inmate request slip on January 20, 2021 for "medical neglect," and explained that his hand was broken but not wrapped, that he was ordered an appointment with an off-site provider, and he was experiencing mental anguish. (Doc. 47-1 at 21).   On January 25, 2021, Ms. Hill, an administrator of Bullock's medical department, responded with a note explaining that Washington's appointment had been rescheduled due to circumstances beyond their control, but that he would be seen.  Dr. Siddiq and Scroggins testified that they were not made aware of these grievances.

Washington testified that throughout this time his pain was a "ten" on a scale of one to ten. (Doc. 58-1 at 24).  At some point during this time, Washington also testified that his mother called the facility about the delay, but was put on hold, and never got a response. (Doc. 58-1 at 11).[4]   On February 8, 2021, a little over two months after his initial appointment with Scroggins, Washington was finally seen by Dr. Chung.  Dr. Chung wrote that Washington's fracture had a "good healing callus" and "volar angulation of the distal fragment." (Doc. 47-1 at 23).  Dr. Chung informed Washington of the risks of surgery, and

---

[4] It is not clear from the record who his mother spoke with at the facility, or who is responsible for the lack of response.

that Washington would need to be careful to keep the wound clean.  Washington "insist[ed] on surgical correction of the angulation." (Doc. 47-1 at 23).  On February 9, 2021, Dr. Siddiq requested an appointment for Washington's surgery with Dr. Chung.

On February 25, 2021, Dr. Chung performed Washington's hand surgery.  The surgery was originally scheduled for February 16, 2021, but it was rescheduled by Ms. Howard due to weather conditions.  Three pins were inserted through the skin of Washington's hand and into the bone, and intentionally left to stick out of the skin.  Dr. Chung instructed Washington not to get his hand wet and prescribed him certain medications, including Tylenol.  Dr. Siddiq described Dr. Chung's order as a "standard postop order." (Doc. 58-2 at 15).  On February 26, 2021, Dr. Siddiq referred Washington to a follow-up appointment with Dr. Chung, which was scheduled for March 16, 2021.

Scroggins testified that after an inmate has surgery, nurses will follow any instructions from the outside provider for wound care.  Further, although not memorialized in a standing order or official policy, nurses require an order before they undertake wound care in certain non-emergency situations, like after surgery.  However, Scroggins also testified that nurses would not leave an inmate who came to see them with "a nasty dressing." (Doc. 58-3 at 20).  The nurses also document each time a wound is cleaned.

Washington testified that his hand pain remained a "ten" after the surgery and remained so throughout the rest of 2021. (Doc. 58-1 at 25, 29).  On March 9, 2021, Washington submitted a sick call request, saying that he thought the pin in his hand had slipped and may be infected.  Washington testified that he felt his hand was infected because it was "hurting, stinging a lot, oozing pus," and "had a real bad smell to it." (Doc.

58-1 at 25).  Washington testified that in the meantime, he had not received any type of wound care or new dressings and was instead left with the same gauze the doctor had wrapped his hand with the day of surgery.  On March 15, 2021, Scroggins completed a Release of Responsibility form, saying that Washington failed to report to a sick call appointment "after several attempts" to call him, and that he "is encouraged to re-sign up for screening if problems persist." (Doc. 47-1 at 36).  Washington testified that he was not notified that he was given the appointment, and that "they do have a history of making sick calls and not notifying the inmate." (Doc. 58-1 at 15).[5]

Washington had his follow-up appointment with Dr. Chung on March 16, 2021, where Dr. Chung removed Washington's stiches and cleaned his pins with an alcohol pad. Dr. Chung wrote that the wound was healing well, the x-ray showed a "good position," and to see him again in three weeks. (Doc. 47-2 at 7–8).  On March 31, 2021, Washington submitted another sick call request, saying, "my hand is infected." (Doc. 47-1 at 38). Scroggins completed a Release of Responsibility form on April 1, 2021, saying that Washington had again failed to show for an appointment after "several attempts to call [him]," and he was "encouraged to re-sign up for screening if problems persist." (Doc. 47-1 at 40).

On April 6, 2021, Dr. Siddiq referred Washington to Dr. Chung to get his pins removed.  Ms. Howard set the appointment for May 5, 2021.  On April 10, 2021, Washington completed another sick call request, indicating that he needed his wounds

---

[5] It was not clear from the record to whom "they" refers.

cleaned.  Washington was seen by health care staff on April 12, 2021, where the nurse's notes indicate his pins were cleaned and re-wrapped.  On April 14, 2021, Washington submitted another sick call request, saying that his hand was infected.  On April 16, 2021, Scroggins saw Washington and referred him to Dr. Siddiq.  Washington was seen by Dr. Siddiq on April 19, 2021 and April 22, 2021.[6]

The notes for the April 22nd visit with Dr. Chung indicate that there was "slight maceration at the upper pin site," and that the x-ray showed that the bones were straight with a good healing callus. (Doc. 47-1 at 51).  Dr. Siddiq testified that maceration occurs when the skin around the wound is wet, and that movement of the pin can cause maceration.[7]  Also on April 22nd, Dr. Chung removed Washington's pins and ordered Tylenol as needed for pain and a wrist brace.  He also ordered another appointment for x-rays of the hand.  Washington testified: "I'm not sure why he didn't take notes of an infection, but I do think somewhere along the line, he prescribed me some antibiotics for like two days." (Doc. 58-1 at 17).

On April 26th, Washington submitted a sick call request for the wrist brace and Tylenol ordered by Dr. Chung.  He was seen that day by Scroggins, who ordered an appointment the next day with Dr. Siddiq.[8]  Dr. Siddiq ordered the wrist brace on April 27,

---

[6] Although the appointment was noted as scheduled for May 5, records show that Washington was seen by Dr. Chung on April 22, 2021. (Doc. 47-1 at 51–53; *see* doc. 47-2 at 9).

[7] Maceration is defined as "[a] softening and breaking down of skin resulting from prolonged exposure to moisture." *Maceration*, NAT'L. LIBR. OF MED., https://www.ncbi.nlm.nih.gov/medgen/108234 (last visited July 1, 2024).

[8] There is a discrepancy concerning which day Washington submitted his sick call request, and which day he was actually seen by Scroggins.  Washington's sick call request was dated April 26, 2021.  Scroggins dated her form April 25, 2021, which would have been prior to Washington placing the request. (*See* Doc.

2021, even though Dr. Siddiq believed that "the wrist brace was not necessary due to the fact that Mr. Washington's injury was to his knuckle and had nothing to do with his wrist." (Doc. 47-2 at 9).   On April 30, 2021, Washington completed another sick call request, asking again for his wrist brace and more pain medication "due to severe pain and nerve damage cause[d] by medical neglect." (Doc. 47-1 at 57).   On May 4, 2021, Scroggins noted again that Washington had failed to report for an appointment after several attempts to call him, and he was "encouraged to re-sign up for screening if problems persist." (Doc. 47-1 at 58).[9]  On May 12, 2021, Washington saw Dr. Chung for the final time, where Dr. Chung noted that Washington's wounds had healed, his fingers could fully extend, and that he could almost make a full fist.  The x-ray showed that the fracture was "healing well." (Doc. 47-1 at 60).   Washington testified that on the date of this appointment, he still had not received his wrist brace.

Eventually, Washington received a wrist brace, but does not remember on which date.  However, Washington testified that the wrist brace "was too small," and he could not "utilize it." (Doc. 58-1 at 21).    Washington was then told that the wrist brace was "all they had." (Doc. 58-1).[10]  Washington submitted two more sick call requests on June 3rd and 5th asking for a handball for therapy, but he never received one.  There is no evidence

_____

47-1 at 54–53; doc. 58-1 at 28).  Either way, Washington was seen within a day of his request, as Dr. Siddiq ordered his brace on the April 27, 2021.

[9] Scroggins' expert report first indicates that this form was completed on April 4th, but then says that it was completed on May 4th. (Doc. 47-3 at 6–7).  The Court assumes the April 4th date was in error, as the form itself was dated May 4th. (Doc. 47-1 at 58).

[10] It is not clear from the record who told this to Washington.

that any medical personnel recommended a therapy ball or that one was necessary. According to Washington, his hand pain still flares up when he is doing something physical.

## V. DISCUSSION

### A. Deliberate Indifference

Because "the Eighth Amendment to the U.S. Constitution prohibits 'the unnecessary and wanton infliction of pain,' it also prohibits 'deliberate indifference to serious medical needs of prisoners.'" *Dempsey v. Sheriff, Bay Cnty. Fla.*, 2024 WL 95441, at *5 (11th Cir. Jan. 9, 2024) (citing *Estelle*, 429 U.S. at 104); *Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023). Thus, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Dempsey*, 2024 WL 95441, at *5 (citing *Estelle*, 429 U.S. at 105).

However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. To prevail on a claim for deliberate indifference, "[a] plaintiff must show that (1) he suffered from an 'objectively serious medical need' and (2) a prison official acted with subjective deliberate indifference to that medical need." *Johnson*, 83 F.4th at 1327 (citing *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020)). Wexford first argues that Washington's deliberate indifference claim fails because he cannot point to any policy or custom that resulted in a constitutional violation. Dr. Siddiq and Scroggins also argue that Washington has failed to produce evidence of either the objective or subjective components of a deliberate indifference claim. The Court examines each argument below.

### 1. *Wexford*

"A private entity, like Wexford, that contracts to provide medical services to inmates performs traditional state functions and, therefore, is treated as a municipality for purposes of § 1983 claims." *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (citing *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)). However, "§ 1983 does not provide for liability under a theory of *respondeat superior*[.]" *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). Thus, to prevail on a claim of deliberate indifference to medical needs against Wexford, Washington "must first show that [Wexford] advanced 'a "policy or custom" of deliberate indifference that led to the violation of [Washington's] constitutional right' before satisfying the discrete requisites of [his] deliberate indifference claims." *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) (citing *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011)).

"In the absence of an official policy endorsing a constitutional violation, a plaintiff must show: (1) that [Wexford] had a custom or practice of permitting such a violation; and (2) that this custom or practice was the 'moving force' behind the violation." *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (citing *Craig*, 643 F.3d at 1310). "Proof of a single incident of unconstitutional activity is not sufficient to" show a custom or policy; a "pattern of similar constitutional violations . . . is 'ordinarily necessary.'" *Craig*, 643 F.3d at 1310 (first citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion), then citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). It "must be such 'a longstanding and widespread practice that it is deemed authorized by the policymaking officials because

they must have known about it but failed to stop it.'" *Roy*, 53 F.4th at 1347 (citing *Craig*, 643 F.3d at 1310).

In support of a custom or policy of allowing these types of constitutional violations, Washington points to the fact that other inmates at Bullock Correctional Facility had filed lawsuits against Dr. Siddiq alleging that they were not given timely medical care. Washington, however, did not submit evidence of these lawsuits or their underlying incidents or outcomes. Consequently, the Court is left only with evidence of Washington's own incident. Because a single incident is not enough to find a custom or practice of permitting the alleged constitutional violation, the Court finds that the claims against Wexford are due to be dismissed. *See Oryang v. Waugh*, 2024 WL 1283813, at *3 (M.D. Ala. Mar. 26, 2024) ("The Eleventh Circuit has held that evidence which is limited to a plaintiff's own treatment amounts to proof of a single incident, which is insufficient to establish a policy or custom for purposes of imposing § 1983 liability." (citing *Craig*, 643 F.3d at 1311)).

### 2. *Dr. Siddiq and Scroggins*

The Defendants next argue that Washington has failed to provide sufficient evidence to support a claim for deliberate indifference against Dr. Siddiq or Scroggins. As for the first component of a deliberate indifference claim, Washington must show that he suffered from an objectively serious medical need. "[A] medical need that is objectively serious 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023) (citing *Goebert v. Lee Cnty.*, 510

F.3d 1312, 1326 (11th Cir. 2007)).  The evidence shows that Washington suffered from a fractured knuckle.  The Defendants do not argue that a fractured knuckle is not a serious injury. (*See* doc. 53 at 9 ("assuming Washington successfully identified and established the existence of a 'serious medical need,' of Washington at the time (which is not denied) . . . )); *see also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[D]efendants do not dispute that a broken foot can be a serious and painful injury."); *Reid v. Streit*, 697 F. App'x 968, 972 (11th Cir. 2017) ("The officers do not dispute that [plaintiff's] broken hand was a serious medical need.").  Indeed, even in "less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Brown*, 894 F.2d at 1538 n.4 (quoting *Estelle*, 429 U.S. at 102) (holding that deliberate delay in providing care for a broken foot, even if only a few hours, is sufficient to state a constitutional claim).  Thus, the Court assumes for purposes of summary judgment that the injury is serious.

As to the subjective component, the Plaintiff must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (citation and quotation omitted) (alteration in original).[11]  The Supreme Court has compared

---

[11] Eleventh Circuit "cases say both that the standard is 'more than mere negligence' and that it is 'more than gross negligence.'" *Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023); *see Iriele v. Griffin*, 2023 WL 8439743, at *4 (N.D. Ala. Dec. 5, 2023).  Recently, in *Wade v. McDade*, 67 F.4th 1363, 1370 (11th Cir.), *reh'g en banc granted, opinion vacated sub nom. Wade v. Georgia Corr. Health, LLC*, 83 F.4th 1332 (11th Cir. 2023), the Eleventh Circuit held that prior panel precedent from *Townsend v. Jefferson Cnty.*, 601 F.3d 1152 (11th Cir. 2010) bound them to a "more than gross negligence" standard. *Wade*, 67 F.4th at 1374.  Consequently, until *Wade* is reheard en banc, "this Court is also bound by *Townsend*," and must apply "more than gross negligence" standard. *Iriele v. Griffin*, 2023 WL 8439743, at *5 (N.D. Ala. Dec. 5, 2023).

deliberate indifference to "subjective recklessness as used in criminal law," and held that while "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835, 839 (1994).  Thus, it is not sufficient to show that Dr. Siddiq and Scroggins "should have known" of a substantial risk of serious harm. *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013).  Scroggins and Dr. Siddiq "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and [they] must also draw the inference*." *Franklin*, 738 F.3d at 1250; *Farmer*, 511 U.S. at 837.  For the reasons stated below, the Court finds that Washington has not pointed to sufficient evidence of deliberate indifference on the part of Dr. Siddiq or Scroggins.

Washington states that "[d]espite having notice that [his] right hand was broken, and that surgery was necessary, the only medical care Defendants rendered to [him] for two months was a prescription for Ibuprofen," and he was not given a splint or wrap. (Doc. 57 at 16).  He argues that this treatment constitutes "medical care which is so cursory as to amount to no treatment at all." *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).  The Court does not agree.

Washington has not pointed to sufficient evidence to show "that he was not given treatment when he was in pain or that he was denied treatment" by Dr. Siddiq or Scroggins.

---

However, for the reasons set forth herein, even under a "more than mere negligence" standard, this Court finds that Washington has not presented sufficient evidence of deliberate indifference.

15

*Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 916 (11th Cir. 2017) (per curiam).  Further, although Washington argues that he was only given ibuprofen to deal with pain, "[t]he failure to administer stronger medication is generally a medical judgment that is not an appropriate basis for imposing liability." *Id.* at 916 (citing *Adams v. Poag*, 61 F.3d 1537, 1547 (11th Cir. 1995)).

Washington also points to the fact that his hand was not wrapped in between his initial appointments with Scroggins and Dr. Siddiq, and his later appointments with Dr. Chung.  However, Dr. Siddiq and Scroggins testified that Washington did not submit a sick call request for a wrap, and they were not made aware of the healthcare grievance where he stated he was not given a wrap.  Further, the fact that neither Dr. Siddiq nor Scroggins decided to wrap his hand is not sufficient to support deliberate indifference on this record. A "simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020).

To the extent Washington argues that the delay between his initial diagnosis and his surgery supports a claim for deliberate indifference, the Court does not agree.  The "intentional denial or delay of medical care is evidence of deliberate indifference," but the evidence is not sufficient to show that Dr. Siddiq or Scroggins intentionally delayed or denied Washington's medical care. *Brown*, 894 F.2d at 1538 (citing *Estelle*, 429 U.S. at 104).  There is insufficient evidence to show that Dr. Siddiq or Scroggins received a sick call request from Washington that they ignored, to which they did not respond, or for which

they did not schedule an appointment.  There is also insufficient evidence to show that any failure to notify Washington as to his appointments, or any rescheduling of appointments, is attributable to Dr. Siddiq or Scroggins.  Instead, the record shows that Dr. Siddiq and Scroggins each timely responded to Washington's requests through their respective processes and treated him according to their medical judgment.  Although it took time for Washington to be seen by an outside provider, there is not sufficient evidence to show that this delay was caused by any deliberate indifference on the part of Dr. Siddiq or Scroggins.

This case is also distinguishable from those cited by Washington.  In *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), the Eleventh Circuit held that even a short delay in the provision of medical services can constitute deliberate indifference, where there was a genuine dispute as to whether two officers knew of the plaintiff's injury yet delayed medical care.  The plaintiff had failed to present evidence, however, that certain other officers knew of the injury during the delay. *Id.* at 1539.  In *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985), the court held that there was a genuine dispute of fact as to whether detectives deliberately delayed for over two hours in responding to an inmate's cut, or whether they were waiting for proper approval to send him to a hospital.  In *Hughes v. Noble*, 295 F.2d 495 (5th Cir. 1961), the Fifth Circuit held that the district court erred in finding that the plaintiff could prove no set of facts in support of his claim for relief where the plaintiff alleged that officers arrested him after a car crash and ignored his cries for medical help for over twelve hours.  Here, unlike these cases, Washington has not pointed to sufficient evidence to create a genuine dispute as to whether Dr. Siddiq or Scroggins

knew of a request from Washington that they ignored, or that they knowingly delayed medical treatment.

The Eleventh Circuit has held that with respect to prisoner medical care, "the Eighth Amendment doesn't require it to be 'perfect, the best obtainable, or even very good.'" *Hoffer*, 973 F.3d at 1271 (citing *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991)). Instead, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 1271 (citing *Harris*, 941 F.2d at 1505). The evidence is insufficient to show that the care provided by Scroggins or Dr. Siddiq was so inadequate that it shocks the conscience. To the contrary, Washington was under the care of two physicians for his broken knuckle. Dr. Chung, who performed Washington's surgery, noted that the hand was healing well, and did not indicate that any intervening care had been inadequate. While Washington takes issue with the speed and level of care provided, he offers insufficient evidence of conduct attributable to Dr. Siddiq or Scroggins which gives rise to an Eighth Amendment claim for deliberate indifference. Consequently, the Court finds that the claim for deliberate indifference is due to be dismissed as to both Defendants.

### B.  State Law Claims

#### 1.  *Negligence*

The Defendants first argue that Dr. Siddiq and Scroggins are not liable under Washington's state law claims because Washington has not provided admissible expert

testimony to establish negligence, as required under the Alabama Medical Liability Act

("AMLA"), Ala. Code § 6-5-548(a).

The AMLA states that in

> any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.

Ala. Code § 6-5-548(a).  The parties do not dispute that the AMLA applies to Washington's

claim for negligence.

In an action under the AMLA, "once the defendant health-care provider offers in

his, her, or its behalf expert testimony that makes a prima facie showing of a lack of

negligence, the health-care provider is entitled to a summary judgment, unless the plaintiff

produces substantial evidence indicating negligence." *Anderson v. Alabama Reference

Lab'ys*, 778 So. 2d 806, 810 (Ala. 2000); *Harris v. Health Care Auth. of City of Huntsville*,

6 So. 3d 468, 477 (Ala. 2008) ("To demonstrate that a genuine issue of material fact exists

in a medical-malpractice action, a nonmovant must present 'expert testimony in support of

[his] claim.'")  (alteration in original) (citing *Swendsen v. Gross*, 530 So. 2d 764, 768 (Ala.

1988)).  To satisfy the "substantial-evidence burden," the Alabama Supreme Court has held

that a plaintiff "ordinarily must present expert testimony from a 'similarly situated health-

care provider' as to (1) 'the appropriate standard of care,' (2) a 'deviation from that

standard [of care],' and (3) 'a proximate causal connection between the [defendant's] act

or omission constituting the breach and the injury sustained by the plaintiff.'" *Fletcher v. Health Care Auth. of City of Huntsville*, 344 So. 3d 347, 351 (Ala. 2021) (citation omitted). However, there is an exception to this rule "where the lack of care is so apparent as to be within the ken of the average layman." *Fletcher v. Health Care Auth. of City of Huntsville*, 344 So. 3d 347, 351 (Ala. 2021).

The Defendants provided expert reports by Dr. Siddiq and Scroggins in their capacities as experts, which show that they did not act with negligence. Thus, the burden shifts to Washington, who does not provide any expert testimony, but instead contends that the alleged negligence in this case falls within the "common knowledge" exception. In other words, the delay in receiving an initial appointment with an off-site provider after the fracture diagnosis, the failure to wrap the hand in the interim, and the delay in corrective surgery demonstrate a lack of care that is so apparent, that it is within the knowledge of an average layman. Further, Washington contends that an "expert opinion is not needed to form such a causal connection to [his] prolonged . . . pain and suffering." (Doc. 57 at 21).

The Alabama Supreme Court has recognized situations where the exception applies to include "where a foreign instrumentality is found in the plaintiff's body following surgery," "where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment," or "when a doctor operates on the wrong member of the body." *Ex parte HealthSouth Corp.*, 851 So. 2d 33, 37–38 (Ala. 2002) (quoting *Allred v. Shirley*, 598 So. 2d 1347, 1350 (Ala. 1992)); *see also Morgan v. Publix Super Markets, Inc.*, 138 So. 3d 982, 989 (Ala. 2013) ("holding that a pharmacy's negligence in dispensing the wrong medication is so apparent that a layperson can understand it without the

assistance of expert testimony.")  In *Ex parte HealthSouth Corp.*, 851 So. 2d 33 (Ala. 2002), the court held that the exception applied where the plaintiff fell after waiting over thirty minutes for a nurse to help her to the restroom.  The court ruled that "[i]t would . . . offend common sense to require the [plaintiffs] to use an expert to aid the jury in determining whether the nurses breached the standard of care by completely ignoring for 30 minutes to an hour a call for assistance by a patient who has just returned from the surgical ward following back surgery and who was under orders not to get out of bed." *Id.* at 38.

The Court finds that Washington cannot establish the applicable standard of care, a breach of the standard of care, or causation "through common knowledge and experience." *See Evans v. Jefferson Cnty. Comm'n*, 2013 WL 5888580, at *7 (N.D. Ala. Nov. 1, 2013). There was no foreign object found in Washington's body, and the hand pain that Washington complains of is connected to the treatment he sought for his hand. *See Ex parte HealthSouth Corp.*, 851 So. 2d at 37–38.  Unlike *Ex parte HealthSouth Corp.*, it would not "offend common sense to require [Washington] to use an expert to aid the jury in determining whether" Dr. Siddiq or Scroggins breached the standard of care by only prescribing ibuprofen, not wrapping his hand, not scheduling an appointment with an off-site specialist sooner, and not diagnosing an infection. 851 So. 2d at 38 (Ala. 2002).  These medical judgments do not demonstrate a lack of care that is "so apparent as to be within the ken of the average layman." *Fletcher v. Health Care Auth. of City of Huntsville*, 344 So. 3d 347, 351 (Ala. 2021).  This case is more akin to the Alabama Supreme Court's reasoning in *McGathey v. Brookwood Health Servs., Inc.*, 143 So. 3d 95 (Ala. 2013), where

the court held that expert testimony was required to establish a doctor's failure "to properly formulate and implement a proper, adequate, and safe plan of care," where the plaintiff's hand was burned during surgery. *Id.* at 103.  Further, it would not offend common sense to require Washington to use an expert to aid the jury in determining a causal connection between these acts and Washington's lasting hand pain, especially considering that neither of these providers performed Washington's hand surgery.

Consequently, because there is no admissible expert testimony to show that Dr. Siddiq or Scroggins' actions breached the standard of care, or that they caused the injuries of which Washington complains, Washington has not met his evidentiary burden for his claim of negligence.  The Court thus finds that the Defendants' motions for summary judgment are due to be granted as to Washington's claim for negligence.

### 2.  *Intentional Infliction of Emotional Distress*

The Defendants also argue that the AMLA applies to Washington's claim for intentional infliction of emotional distress, which Washington does not dispute.  Thus, the Court assumes without deciding that the AMLA applies to this claim.[12]  Consequently, it

---

[12] "[T]he AMLA applies to claims (1) against a health-care provider (2) for 'medical injury' (3) based on a breach of the standard of care." *Ex parte Chin*, 2023 WL 3263042, at *2 (Ala. May 5, 2023); *see* Ala. Code § 6-5-548(a).  The Supreme Court of Alabama has held that the AMLA applies to more torts than just medical malpractice. *See Collins v. Ashurst*, 821 So. 2d 173, 176 (Ala. 2001), *as modified on denial of reh'g* (Nov. 30, 2001) ("the AMLA recognizes the possibility that more than one type of action may be brought under that act").  "[T]he AMLA is not just concerned with who committed the alleged wrongful conduct or when and where that conduct occurred, but also with whether the harm occurred because of the provision of medical services." *Ex parte Vanderwall*, 201 So. 3d 525, 537 (Ala. 2015).

However, intentional infliction of emotional distress, also known as the tort of outrage, requires the plaintiff to show "that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, 266 So. 3d 674, 676 (Ala. 2017) (citing *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)).  At first glance, the requirement that the conduct be intentional appears at odds with the AMLA's application to torts based on a breach of

too fails because Washington has not provided expert testimony, and the Court finds that this claim is due to be dismissed.

Washington's claim for intentional infliction of emotional distress is also due to be dismissed for the same reasons as Washington's claim for deliberate indifference. Namely, that Washington has not pointed to sufficient evidence to show the intent requirement for either Dr. Siddiq or Scroggins.

Further, in the tort of outrage, "[t]he conduct complained of must 'be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society.'" *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, 266 So. 3d 674, 676–77 (Ala. 2017) (citing *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). The Alabama Supreme Court has only recognized the tort of outrage in the most extreme circumstances, including "wrongful conduct within the context of family burials; an insurance agent's coercing an insured into settling an insurance claim; []egregious sexual harassment[;]" and "when a family

---

the standard of care. *See Ex parte Vanderwall*, 201 So. 3d 525, 539 (Ala. 2015) (holding that the AMLA did not apply to plaintiff's claims for sexual assault against doctor) ("[Louisiana's medical-malpractice act] is only triggered by the negligent care and treatment of the patient. Were the provider to commit an intentional tort against his patient or negligently injure his patient in a manner unrelated to medical treatment, the" act would not apply. (quoting *Descant v. Administrators of Tulane Educational Fund*, 639 So. 2d 246, 250 (La. 1994))).

On the other hand, the AMLA states that the definition for "standard of care" "applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether based on *intentional or unintentional conduct*." Ala. Code § 6-5-542 (emphasis added). Further, in *Cobb v. Fisher*, 20 So. 3d 1253 (Ala. 2009), the Supreme Court of Alabama held that the striking of plaintiff's expert testimony was "fatal to the action," which included a claim for outrage. 20 So. 3d at 1259. In *Barton v. Am. Red Cross*, 829 F. Supp. 1290 (M.D. Ala. 1993), *aff'd*, 43 F.3d 678 (11th Cir. 1994), and *aff'd*, 43 F.3d 679 (11th Cir. 1994) the court, in applying the AMLA, found that because the plaintiffs' expert was "not competent and because the [plaintiffs] have failed to submit other admissible expert testimony, both the [defendants] are entitled to summary judgment," where the claims included outrage. *Id.* at 1302. Nevertheless, the court went on to examine the merits in the alternative. This Court takes the same approach.

physician engaged in a homosexual relationship with a minor patient, and, provided narcotic medication to the minor despite indications that he was developing addictive tendencies." *Drew v. Quest Diagnostics*, 992 F. Supp. 2d 1177, 1186 (N.D. Ala. 2014) (first citing *Callens v. Jefferson Cnty. Nursing Home*, 769 So. 2d 273 (Ala. 2000), then citing *O'Rear v. B.H.*, 69 So.3d 106, 118–19 (Ala. 2011) (*abrogated on other grounds by Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015))).  The "Defendants' alleged actions (or inactions) in this case do not fall within any of the categories for which the Alabama Supreme Court previously has allowed an outrage action, and they are not sufficiently extreme or outrageous to warrant recognizing the tort in an entirely new context." *See Drew v. Quest Diagnostics*, 992 F. Supp. 2d 1177, 1186 (N.D. Ala. 2014) (granting judgment on the pleadings for the defendants on the tort of outrage where the plaintiff falsely tested positive for HIV and herpes).

For the reasons stated, the Court finds that the motions are due to be granted as to the claim for intentional infliction of emotional distress. [13]

## VI. CONCLUSION

Accordingly, and for good cause, it is

ORDERED that the Defendants' Motions for Summary Judgment (doc. 45; doc. 48; doc. 51) are GRANTED, and the Plaintiff's claims are DISMISSED with prejudice.  It is further

---

[13] Because the state law claims are due to be dismissed against Dr. Siddiq and Scroggins, the claims for vicarious liability against Wexford Health are also due to be dismissed. *See Alfa Life Ins. Corp. v. Jackson*, 906 So. 2d 143 (Ala. 2005) (holding that the dismissal of tort claims with prejudice against an agent exonerated the principal from vicarious liability).

ORDERED that all deadlines are terminated and all pending motions are DENIED as moot.

A separate Final Judgment will enter.

Done this 2nd day of July, 2024.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE